989 F.2d 501
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Larry L. SMITH, Petitioner,
v.
NATIONAL TRANSPORTATION SAFETY BOARD, and Administrator,
Federal Aviation Administration, Respondents.
 No. 92-3681.
 United States Court of Appeals, Sixth Circuit.
 March 11, 1993.
 
 Before NATHANIEL R. JONES and DAVID A. NELSON, Circuit Judges, and LIVELY, Senior Circuit Judge.
 PER CURIAM.
 
 
 1
 Larry L. Smith, D.O., here petitions for review of an order of the National Transportation Safety Board affirming an administrative law judge's decision to suspend Dr. Smith's private pilot certificate for 90 days. The suspension was based on a finding that the doctor had been the pilot in command of an aircraft that entered controlled air space without authorization. Applying standards of review mandated by statute, we conclude that there is no infirmity in the Board's order. We shall therefore deny the petition.
 
 
 2
 * On August 5, 1987, a Cessna Model 182 aircraft designated N182TF was airborne in the vicinity of the Detroit Metropolitan Airport. The plane was flying from Denmond Field, near Youngstown, Ohio, to Oshkosh, Wisconsin. On board were Dr. Smith, Patrick Ruddy, and Beverly Keshari, who later became Dr. Smith's fiancee.
 
 
 3
 Mr. Ruddy, a pilot, had a single engine land rating. There was a felony drug conviction on his record, and he did not have a medical certificate. He was not supposed to fly airplanes without such a certificate.
 
 
 4
 Mr. Ruddy had contacted John Molick, the record owner of N182TF, about securing transportation to Oshkosh. Mr. Ruddy subsequently testified that Mr. Molick had agreed to allow him to use the aircraft as long as Dr. Smith acted as "pilot in command."[1]
 
 
 5
 On their way to Oshkosh, Mr. Ruddy sat in the left front seat of the airplane. He testified that he did not recall operating the controls. Dr. Smith testified that Mr. Ruddy, who said that he was the beneficial owner of N182TF, pre-flighted and fueled the aircraft on the day of the flight, flew the aircraft for the entire flight, and used the radio through a headset. Ms. Keshari also testified that Mr. Ruddy was the one who flew the plane.
 
 
 6
 On the morning of the flight the person using the radio on board N182TF contacted Detroit Metro Air Traffic Control and notified Controller James Berbrich that he was over the Windsor-Michigan, area at 4,500 feet. This position is very near the border of the outer ring of the Detroit Metro Terminal Control Area, or "TCA."[2] At the time of this transmission N182TF was not in Controller Berbrich's airspace, so the radioman was handed over to Controller Thomas Hays, who was responsible for the airspace in question. Controller Berbrich did not grant N182TF permission to enter the TCA.
 
 
 7
 N182TF was twice frustrated in its attempts to contact Controller Hays because of poor transmission quality. On the third attempt, the radioman aboard N182TF identified himself with the aircraft's call sign and requested visual flight rules service. Controller Hays then issued a beacon code for N182TF. At this point he noticed that the plane was at least five miles inside the outer ring of the TCA. The aircraft was travelling in a northwesterly direction. Controller Hays had not yet cleared the aircraft to enter the TCA. No other traffic was in the Windsor area, and thus the incursion created no actual hazard, but if N182TF had continued along its original flight path it would have come into conflict with traffic climbing eastward from Detroit.
 
 
 8
 Controller Hays instructed the aircraft to change course to take it away from Detroit Metro. He also asked the radioman who the pilot was. The radioman responded "Larry Smith." After the aircraft entered Controller Berbrich's air space Controller Hays switched N182TF back to Controller Berbrich's frequency. Controller Berbrich also asked for the name of the pilot. The radioman again responded "Larry Smith."
 
 
 9
 On February 22, 1988, the Administrator of the Federal Aviation Administration suspended Dr. Smith's private pilot certificate for 90 days. The Administrator concluded that Dr. Smith had violated section 91.90(b)(1)(i) of the Federal Aviation Regulations, see supra note 2, by operating an aircraft in a careless manner so as to endanger the life or property of another and 14 C.F.R. § 91.5 (recodified at 14 C.F.R. § 91.103(a) (1991)) by operating an aircraft without having familiarized himself with all available information concerning the flight.
 
 
 10
 Dr. Smith filed an appeal of the Administrator's order with the Board on March 18, 1988. After a hearing at which Dr. Smith appeared pro se, an administrative law judge affirmed the Administrator's order of suspension. Dr. Smith appealed the ALJ's decision to the Board on May 5, 1989. The Board issued an opinion and order on May 15, 1992, in which it denied Dr. Smith's appeal and affirmed the ALJ's decision and order.
 
 II
 
 11
 The Board's orders must be upheld unless they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); see also McCarthney v. Busey, 954 F.2d 1147, 1153 (6th Cir.1992). We must defer to the Board's factual findings if they are supported by substantial evidence in the record. See Section 1006(e) of the Federal Aviation Act, 49 U.S.C.app. § 1486(e); Blackman v. Busey, 938 F.2d 659, 661 (6th Cir.1991).
 
 
 12
 Dr. Smith contends that he was deprived of a fair hearing because he did not receive a copy of the Board's Rules of Practice in Air Safety Proceedings. The record indicates that the Board sent Dr. Smith a copy of these rules. Even if it did not, however, the record does not show that Dr. Smith ever requested a copy, notwithstanding that he received a letter stating that the rules had been enclosed. Dr. Smith has failed to demonstrate, moreover, that he was prejudiced as a result of the alleged error.[3]
 
 
 13
 Dr. Smith asserts that the administrative law judge unnecessarily and prejudicially hurried the proceedings. The ALJ was undoubtedly concerned with keeping the proceedings moving, but he did not impermissibily restrict their scope. Dr. Smith was given relatively broad latitude in his pro se questioning.
 
 
 14
 The central issue of fact before the ALJ was whether Dr. Smith was or was not the pilot in command. The ALJ found that he was, and we are not persuaded that there was insufficient evidence to support this finding. Mr. Ruddy testified that it was agreed that Dr. Smith would be the pilot in command. Air traffic controllers testified that the radioman aboard N182TF twice identified the pilot as "Larry Smith." It is true that Dr. Smith and Ms. Keshari both testified that Mr. Ruddy was the pilot for the entire flight, but the ALJ, who saw and heard the witnesses, was in the best position to resolve the conflicts in their testimony. The ALJ's credibility determinations deserve our respect, and the evidence supporting his ultimate finding was sufficiently substantial to warrant affirmance.[4]
 
 
 15
 Dr. Smith also argues that the incursion into Detroit Metro air space created only a potential, and not an actual, endangerment of the life or property of another. To establish that a person's operation of a fixed-wing aircraft was so reckless or careless as to endanger the life of another, however, the Administrator need only show that the life or property of another was potentially endangered. See Haines v. Department of Transp., 449 F.2d 1073, 1076 (D.C.Cir.1971). Such a showing was made here.
 
 
 16
 Dr. Smith maintains that he was not in violation of the familiarization rule because he had a sectional map of the Detroit Metro area in the cockpit. The rule states that a pilot in command shall, before beginning a flight, familiarize himself with all information concerning the flight. This information includes TCA boundaries, see Administrator v. Bruder, NTSB Order No. EA-3147, 1990 WL 339005, 1990 NTSB LEXIS 94, * 7 (1990), and such boundaries are not shown on sectional maps. The finding that Dr. Smith flew into the Detroit Metro TCA without authorization supports the conclusion that he was unfamiliar with the TCA boundaries. The fact that he had a sectional map in the cockpit does not indicate otherwise.
 
 
 17
 Two final assertions of error remain to be considered. First, Dr. Smith contends that the air traffic controllers contributed to the TCA incursion by failing to prevent it. This contention is meritless because section 91.90(b)(1)(i) provides that a pilot cannot enter a TCA unless he has requested clearance prior to entry. Second, Dr. Smith requests a new hearing to consider "new evidence" from John Molick concerning Mr. Ruddy's truthfulness. Dr. Smith has not established, however, that this evidence "could not have been discovered by the exercise of due diligence prior to the date of the hearing." 49 C.F.R. § 821.50(c). Moreover, requests to reopen for the consideration of new evidence are properly made in "[p]etitions for rehearing, reargument, reconsideration, or modification of an order to the Board." 14 C.F.R. § 821.50. No such petition was presented to the Board.
 
 
 18
 The petition for review is DENIED.
 
 
 
 [1]
 The "pilot in command" is the individual who is responsible for the safe operation of the aircraft. The pilot in command can delegate certain functions to other persons, but remains pilot in command even if someone else is operating the controls of the aircraft. See 14 C.F.R. § 91.3(a) (1992). Dr. Smith is certified for single engine land aircraft, but is not qualified to fly "high performance" aircraft such as the Cessna 182
 
 
 [2]
 Section 91.90(b)(1)(i) of the Federal Aviation Regulations, 14 C.F.R. § 91.90(b)(1)(i) (1987) (recodified at 14 C.F.R. § 91.131(a)(1) (1991)) establishes that it is a violation to operate an aircraft within a TCA without having received appropriate prior authorization from air traffic control
 
 
 [3]
 Dr. Smith asserts that had he received a copy of the rules, he would have learned of his right to subpoena records. He has not shown however, that knowledge of this right would have changed the result of the administrative proceedings. See Blackman, 938 F.2d at 664
 
 
 [4]
 Dr. Smith argues that the voice on the air traffic control tape was not his. The record, however, contains no evidence concerning this point. The record does indicate that the ALJ erred in stating that Dr. Smith regularly flew in the Detroit Metro area, but the Board knew that this was not so and affirmed the ALJ's decision anyway. We cannot say that the Board erred in doing so